**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE WESTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| ──────────────────────── x | | |
| In re | : | Involuntary Chapter 11 |
| | : | |
| WHITE STAR PETROLEUM, LLC | : | Case No. 19-12145-JDL |
| | : | |
| Putative Debtor. | : | |
| ──────────────────────── x | : | |

**MOTION OF WHITE STAR PETROLEUM, LLC FOR ENTRY**
**OF AN ORDER DISMISSING THE INVOLUNTARY CASE**
**WITH NOTICE OF OPPORTUNITY FOR HEARING**
**AND CERTIFICATE OF SERVICE**

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ...........................................................................................1

STATEMENT OF FACTS ..................................................................................................3

    A.    Background ...........................................................................................3

    B.    White Star's Preparations for Chapter 11 ...........................................4

    C.    Prepetition Communications with the Petitioning Creditors ...................6

    D.    The Petitioning Creditors' Admissions at the Status Conference...........7

JURISDICTION ...............................................................................................................7

RELIEF REQUESTED ......................................................................................................8

BASIS FOR RELIEF ........................................................................................................8

    A.    The Involuntary Petition Was Filed in Bad Faith and Should Be Dismissed..........8

    B.    The Involuntary Case Should be Dismissed Because the Involuntary Petition Fails to Satisfy the Requirements of Section 303(b)(1)........................................11

    C.    The Court Should Abstain from the Involuntary Case. .........................................14

CONCLUSION ...............................................................................................................17

NOTICE OF OPPORTUNITY FOR HEARING ..........................................................................17

SC1:4949568.6

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

### Cases

*Bartmann* v. *Maverick Tube Corp.*,
   853 F.2d 1540 (10th Cir. 1988) ............................................13

*In re Caesars Entm't Operating Co.*,
   No. 15-10047 (KG), 2015 WL 495259 (Bankr. D. Del. Feb. 2, 2015)...................16

*In re Cannon Express Corp.*,
   280 B.R. 450 (Bankr. W.D. Ark. 2002) ...................................10

*In re Eastman*,
   188 B.R. 621 (B.A.P. 9th Cir. 1995)......................................14

*In re ELRS Loss Mitigation, LLC*,
   325 B.R. 604 (Bankr. N.D. Okla. 2005) ........................12, 14, 15

*In re Forest Hill Funeral Home & Mem'l Park*,
   364 B.R. 808 (Bankr. E.D. Okla. 2007)..................................14

*In re Forever Green Athletic Fields, Inc.*,
   500 B.R. 413 (Bankr. E.D. Penn. 2013), *aff'd by Forever Green Athletic*
   *Fields, Inc.*, 804 F.3d 328 (3d Cir. 2015) .......................8, 9, 10

*In re Henry S. Miller Commercial, LLC*,
   418 B.R. 912 (Bankr. N.D. Tex. 2009)..................................11

*In re Hentges*,
   351 B.R. 758 (Bankr. N.D. Okla. 2006) ........................8, 9, 10, 12

*In re Kenval Mktg. Corp.*,
   38 B.R. 241 (Bankr. E.D. Pa. 1984) ....................................13

*In re Kreidler Imp. Corp.*,
   4 B.R. 256 (Bankr. D. Md. 1980) ......................................13

*In re Luxeyard, Inc.*,
   556 B.R. 627 (Bankr. D. Del. 2016) ....................................9

*In re Reid*,
   773 F.2d 945 (7th Cir. 1985) ..........................................10

*In re Rocor Int'l Inc.*,
   380 B.R. 567 (B.A.P. 10th Cir. 2007) .................................16

*In re Spade*,
    258 B.R. 221 (Bankr. D. Colo. 2001) ..................................................................14

*In re Tichy Elec. Co.*
    332 B.R. 364 (Bankr. N.D. Iowa 2005) ...............................................................9

*In re WLB-RSK Venture*,
    296 B.R. 509 (Bankr. C.D. Cal. 2003) ...........................................................8, 10

**Statutes and Rules**

11 U.S.C. 303(b) ...............................................................................................1, 11, 12

28 U.S.C. § 157 ..........................................................................................................7

28 U.S.C. § 1334 ........................................................................................................7

28 U.S.C. § 1408 ........................................................................................................7

28 U.S.C. § 1409 ................................................................................................1, 12

W.D. Okla. Local Court Rule 81.4(a) .......................................................................7

**Other Authorities**

H.R. REP. NO. 95-595, *reprinted in* 1978 U.S.C.C.A.N. 5787 .................................16

PETITION, May 29, 2019, *available at* https://petition.substack.com/p/retail-
    earnings-suck-oil-and-gas .............................................................................11

SC1:4949568.6

White Star Petroleum, LLC, a voluntary debtor-in-possession in the District of Delaware ("WSP LLC", and together with its affiliated debtors-in-possession, "White Star"), hereby submits this motion for entry of an order:  (i) dismissing the above-captioned involuntary case (the "Involuntary Case") purportedly commenced pursuant to section 303(b) of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq*. (the "Bankruptcy Code") by the involuntary petition filed by the Petitioning Creditors[1] on May 24, 2019 (the "Involuntary Petition"); and (ii) reserving the rights of White Star to seek actual and punitive damages from the Petitioning Creditors pursuant to section 303(i) of the Bankruptcy Code.  In support of this motion, WSP LLC relies upon the *Declaration of Dan Bafia In Support of the Motion of White Star Petroleum LLC for Entry of an Order Dismissing the Involuntary Case* (the "Bafia Declaration" or "Bafia Decl.") filed contemporaneously herewith, and the *Declaration of Jeffery J. Zanotti In Support of Debtors' Chapter 11 Petitions and First Day Pleadings* (the "Zanotti Declaration" or "Zanotti Decl.", filed at Docket No. 2 in White Star's voluntary chapter 11 proceedings (the "Voluntary Cases") in the United States Bankruptcy Court for the District of Delaware (the "Delaware Court") and filed in this Court contemporaneously herewith, and respectfully states as follows:[2]

## PRELIMINARY STATEMENT

1.     On May 28, 2019, White Star commenced the Voluntary Cases in the Delaware Court to protect operations, and to market and sell White Star's business as a going concern.  (Zanotti Decl. ¶¶ 46-47.)  For weeks prior to that date, White Star and its fiduciaries

---

[1]   The "Petitioning Creditors" are Mustang Heavy Haul, LLC, Latshaw Drilling Company, LLC, MS Directional LLC, Baker Hughes Oilfield Operations, LLC and Cactus Drilling Company, LLC.

[2]   WSP LLC reserves all rights to call witnesses and introduce additional evidence in support of its Motion to Dismiss at the evidentiary hearing scheduled to begin on June 26, 2019.

worked to secure postpetition financing that provides sufficient liquidity to support White Star's

business, pay its employees and to protect its critical stakeholders during this marketing process.

(*Id.* at ¶ 65.)  These negotiations were difficult and existential.  Had White Star's prepetition

secured lenders not agreed to finance White Star's operations during the postpetition marketing

period, White Star would have been forced to terminate operations, lay off most of its 169

employees and liquidate in the near term, thereby resulting in irreparable consequences for its

stakeholders.  (*Id.*)

2.       But no good deed goes unpunished.  With rumors swirling of White Star's

imminent bankruptcy, the Petitioning Creditors—a small group of creditors no longer doing

business with White Star and purporting to be secured by mechanic's and materialmen's liens

("mechanic's liens")—became concerned that White Star would commence their proceedings in

Delaware, which they perceived as an unfavorable venue for their own claims.  To force White

Star's chapter 11 proceedings into what they perceived as a more friendly court for them, the

Petitioning Creditors surprised White Star with the Involuntary Petition.  The Petitioning

Creditors did so to further their own interests without regard for the fact that their reckless action

could have caused the severe disruption, or even the liquidation, of White Star's business.[3]

3.       The egregious nature of the Involuntary Petition is further solidified by the

fact the Petitioning Creditors are merely holders of disputed and contingent claims that fail to

satisfy section 303(b)(1) of the Bankruptcy Code because they collectively received $3.745

million in payments during the 90-day preference period that must be disgorged to White Star.

---

[3]     Thankfully for White Star's employees and other stakeholders, when the Involuntary Petition
was filed White Star was on the verge of securing a binding commitment for debtor-in-
possession financing and agreement on the use of cash collateral, and being prepared to seek
first day relief upon commencement of the Voluntary Cases—all of which is necessary to
voluntarily file an orderly chapter 11 case.

The preference exposure is so significant on the facts of this case that there is a bona fide dispute whether these Petitioning Creditors have any allowable unsecured claim at all when comparing the size of the preference payments to the expected recoveries on unsecured claims.

4.       The case law is clear that involuntary bankruptcy filings may not be used by a small group of creditors to strategically promote their interests at the expense of others. This is what happened here, and it is quintessential bad faith and grounds for dismissal.  If this Court were to reward the Petitioning Creditors' conduct, creditors in future cases will be incentivized to "jump the gun" to force venue into the jurisdiction perceived as most favorable to their parochial interests.  This would set a dangerous precedent that would undermine future debtors' ability to plan carefully, build consensus, secure case financing needed to pay employees and critical vendors, and select a venue that the debtors, as fiduciaries, determine will maximize the value of their estates for all stakeholders.  Therefore, even if the Court does not find bad faith (and it should), the Court should still dismiss the Involuntary Case on permissible abstention grounds pursuant to section 305 of the Bankruptcy Code.

## STATEMENT OF FACTS

### A.       Background

5.       White Star engages in the acquisition, development, exploration and production of oil, natural gas, and natural gas liquids located in the Mid-Continent region in the United States.  (Zanotti Decl. ¶ 10.)  WSP LLC, the putative debtor, is one of White Star's operating subsidiaries.  WSP LLC's parent, White Star Petroleum Holdings, LLC, is the lead debtor in White Star's Voluntary Cases.

6.       White Star is headquartered in Oklahoma City, Oklahoma and employs 169 people.  (*Id.* at ¶ 8.)  As of December 2018, White Star owned approximately 315,000 net leasehold acres, primarily in Creek, Dewey, Garfield, Lincoln, Logan, Noble, and Payne counties

-3-

of Oklahoma. Approximately 80% of the total acreage was held by production.  As of December 31, 2018, White Star had an interest in a total of 883 gross productive wells (475 net) of which 590 were operated (451 net).  (*Id.* at ¶¶ 12-14.)  White Star is not currently drilling any new wells.

7.      Late in the afternoon on Friday, May 24, 2019, the Petitioning Creditors filed the Involuntary Petition against WSP LLC with this Court.

8.      On Tuesday, May 28, 2019 (the "Voluntary Petition Date"), each of the White Star entities filed a voluntary petition for relief under the Bankruptcy Code with the Delaware Court.  White Star continues to operate its business and manage its properties as a debtor-in-possession in the Voluntary Cases pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, subject to this Court's order limiting the matters that may proceed before the Delaware Court pending adjudication of this motion.

9.      No creditors' committee, trustee or examiner has been appointed in White Star's Voluntary Cases, but, in accordance with this Court's order dated May 31, 2019 [Docket No. 24], the U.S. Trustee's Office for the District of Delaware is expected to appoint an unsecured creditors' committee on Monday, June 10, 2019.

10.     Additional factual background relating to the White Star's businesses and the commencement of the Voluntary Cases is set forth in detail in the Zanotti Declaration.[4]

**B.      White Star's Preparations for Chapter 11**

11.     White Star comprehensively prepared a potential chapter 11 filing for several weeks prior to the Voluntary Petition Date.  As detailed in the Zanotti Declaration, in

---

[4]    Capitalized terms not defined in this motion shall have the meaning given to such terms in the Zanotti Declaration.

February 2019, White Star negotiated an amendment to its RBL Credit Agreement in anticipation of a scheduled borrowing base redetermination on April 30, 2019.  Pursuant to the amendment, White Star was required to refinance its RBL Credit Agreement and certain other debt on or before April 15, 2019.  White Star was unable to do so.  (Zanotti Decl. ¶ 45.)

12.    At that point, White Star began bankruptcy preparations in earnest.  The terms of the February amendment required White Star to begin a marketing process to sell its business, which White Star promptly commenced in mid-April and is ongoing.  (*Id.* at ¶ 46.) White Star recognized that in light of its financial condition, a bankruptcy proceeding likely would be required to maximize the value achieved in an orderly sale of its business.  In addition, White Star faced an imminent event of default under its RBL Credit Agreement as a result of the April 30, 2019 borrowing base determination.  (*Id.* at ¶ 44.)  Accordingly, White Star urgently planned for chapter 11 throughout the second half of April and all of May.  (Bafia Decl. ¶ 3.)

13.    White Star believes that marketing its business as a going concern is the best process to maximize the sale proceeds.  (*Id.* at ¶ 4.)  In addition, a successful going concern sale is the only way to preserve the maximum number of jobs for White Star employees and result in the assumption of many of the contracts between White Star and its trade creditors. (*Id.*)  Accordingly, White Star's bankruptcy preparations were particularly focused on obtaining debtor-in-possession financing that provided sufficient liquidity to permit an organized bankruptcy that would facilitate a going concern transaction, the payment of wages to its employees, and satisfaction of postpetition obligations.  (Zanotti Decl. ¶¶ 49-50.)  The negotiations for financing were contentious and protracted, and there was no certainty that White Star would be able to reach agreement with its secured lenders.  Indeed, White Star did not have certainty as to financing until the secured lenders agreed to terms on the eve of filing the

voluntary petitions.  (Zanotti Decl. ¶ 63.)  White Star voluntarily filed for bankruptcy as soon as it could do so in an organized and responsible manner.

### C.    Prepetition Communications with the Petitioning Creditors

14.    Beginning on May 1, 2019, and continuing through the period leading up to the filing of the Voluntary Cases, White Star was unable to make payments to trade creditors or other disbursements because its secured lenders had swept White Star's cash and would only authorize critical expenditures.  (Zanotti Decl. ¶ 49; Bafia Decl. ¶ 5.)  While White Star had been making payments to creditors (including the Petitioning Creditors), beginning May 1, 2019, White Star informed many of its trade vendors it would be holding payments pending review of its financial situation.  (Bafia Decl. ¶ 5.)  As a result, White Star understood that rumors of White Star's impending bankruptcy quickly spread through its vendor community, and were common knowledge by mid-May.  (*Id.*)

15.    In response to the interruption of payments and rumors of bankruptcy, at least three of the Petitioning Creditors were in repeated contact with representatives of White Star with questions about whether White Star was planning to file for bankruptcy protection.  (*Id.* at ¶ 6.)  During those conversations, White Star separately informed Mr. Trent Latshaw, the controlling owner of two of the Petitioning Creditors and Mr. Ron Davis of Baker Hughes, a third Petitioning Creditor, that White Star continued to evaluate all of its options.  (*Id.*)  In one such conversation with Mr. Latshaw, he expressed concerns of mechanic's liens given the unfavorable outcome his companies had experienced in prior bankruptcy cases.  (*Id.*)

16.    Approximately one week before filing the Involuntary Petition, Mr. Latshaw again contacted White Star and received confirmation that the White Star board of directors had met and that White Star was continuing to evaluate its options with respect to a bankruptcy filing but no final decision had been made.  (*Id.*)

-6-

17.     Without any further discussions or notice, the Petitioning Creditors filed the Involuntary Petition on May 24, 2019.

### D.     The Petitioning Creditors' Admissions at the Status Conference

18.     At the status conference held before the Court on May 31, 2019, counsel for the Petitioning Creditors acknowledged that the Petitioning Creditors had intentionally surprised White Star with the Involuntary Petition, and had made no effort to investigate the status of White Star's bankruptcy preparations or the potential consequences of the Involuntary Petition on White Star's business immediately before filing.  (May 31, 2019 Hr'g Tr. at 27:1-5.) Counsel for certain of the Petitioning Creditors went further and admitted that he preferred venue in this Court because:

> Delaware has historically been a little less favorable in terms of whether or not the creditor is going to receive as much as he would receive if it were in Oklahoma.  And . . . this is oil and gas law, oil and gas mechanics and materialman's lien law that's going to be the driver of whether or not these secured creditors trump our liens. You're a person that knows more about this than any judge in Delaware, Your Honor.

(May 31, 2019 Hr'g Tr. at 34:7-16.)

## JURISDICTION

19.     The Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334 and Rule 81.4(a) of the Local Court Rules of the United States District Court for the Western District of Oklahoma.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue for purposes of considering this motion is proper in the Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory predicates for the relief requested herein are sections 303 and 305 of the Bankruptcy Code.

SC1:4949568.6

## RELIEF REQUESTED

20.     By this Motion, the Debtors respectfully request entry of an order dismissing the Involuntary Case and reserving White Star's rights to seek actual and punitive damages pursuant to section 303(i) of the Bankruptcy Code.

## BASIS FOR RELIEF

### A.     The Involuntary Petition Was Filed in Bad Faith and Should Be Dismissed

21.     The Petitioning Creditors' involuntary petition, even if filed by the requisite number of creditors with bona fide claims required by section 303(b)(1), must be dismissed if filed in bad faith.  *See In re WLB-RSK Venture*, 296 B.R. 509, 513 (Bankr. C.D. Cal. 2003); see also *In re Forever Green Athletic Fields, Inc.* ("Forever Green I"), 500 B.R. 413, 424 (Bankr. E.D. Penn. 2013) (noting "the fact that [a petitioning creditor] is a judgment creditor does not establish that he invoked the Court's jurisdiction for a proper bankruptcy purpose. . . . the bad faith inquiry is a separate and independent [sic] from the inquiry as to a creditor's bona fides."); *aff'd by In re Forever Green Athletic Fields, Inc.* ("Forever Green II"), 804 F.3d 328, 335 (3d Cir. 2015) (reasoning that "[a]llowing for the dismissal of bad-faith filings will encourage creditors to file petitions for proper reasons").

22.     "The Tenth Circuit Court of Appeals has not had an occasion to develop criteria for determining whether an involuntary petition has been filed in bad faith."  *In re Hentges*, 351 B.R. 758, 770 (Bankr. N.D. Okla. 2006).  However, most courts (including the *Hentges* court) have concluded that "bad faith may be imputed to a bona fide creditor when that creditor has filed an involuntary petition for a non-bankruptcy purpose."  *Forever Green I*, 500 B.R. at 424.  The question of whether an involuntary petition was "proper" goes far beyond a consideration of whether a petitioning creditor complied with the rote requirements of section 303(b)(1).  Rather, an involuntary filing should be dismissed unless it was filed to prevent a

-8-

debtor from making preferential transfers or wasting assets. *See, e.g., Forever Green II*, 804 F.3d at 335; *In re Tichy Elec. Co.* 332 B.R. 364, 372 (Bankr. N.D. Iowa 2005) ("The goal or purpose of an involuntary filing should be the equal distribution of assets among creditors.").

23.     Here, the Petitioning Creditors had no basis to conclude that White Star was delaying its bankruptcy to make preferential transfers to its other creditors. Indeed, the Petitioning Creditors (and the rest of the industry) were well-aware that White Star had stopped making payments to nearly all of its creditors as of May 1, 2019 following the secured lenders' sweep of White Star's cash. (Bafia Decl. ¶ 5.) In response, certain of the Petitioning Creditors were in contact with representatives of White Star and knew that the White Star board was evaluating all of the available options and that those options included bankruptcy. (*See id.* ¶ 6.)

24.     In addition, the Petitioning Creditors made no effort to learn whether their Involuntary Petition would be harmful to the value of WSP LLC or the impact it would have on the other White Star affiliates that we not filed as part of the Involuntary Case and did not receive the benefit of the automatic stay provided by section 362 of the Bankruptcy Code. They did not know whether White Star was prepared to enter bankruptcy without severe disruption to its operations, or if their actions would interfere with a sale of White Star's business.[5] At the status conference before the Court, counsel to the Petitioning Creditors admitted that no such inquiries were made, and asserted that no notice to White Star was required. (May 31, 2019 Hr'g

---

[5]    Certain courts have applied the "Rule 11 test" to determine if a petitioning creditor acted in bad faith. The Rule 11 test includes a subjective prong akin to the improper purpose test and an objective prong that asks "whether the petitioner made a reasonable inquiry into the facts and law surrounding the case prior to filing the involuntary petition." *In re Luxeyard, Inc.*, 556 B.R. 627, 641 (Bankr. D. Del. 2016). This objective prong is similar to an "objective test" for bad faith applied by a limited number of courts. *See, e.g., Hentges*, 351 B.R. at 771. The Petitioning Creditors failure to inform themselves of White Star's situation—or to first seek remedies in state court—was without due regard for the estates and all stakeholders, and therefore fails any objective test.

Tr. at 25: 4-9; 27:1-5.)  The attempt to summarily dismiss the notice issue misses the point.  The Petitioning Creditors recklessly disregarded that filing an involuntary petition "is an extreme remedy with serious consequences" (*In re Reid*, 773 F.2d 945, 946 (7th Cir. 1985)), and, focusing on their individual claim recovery issues, never considered whether "the *collective* interests of [White Star's] creditors would benefit from the invocation of bankruptcy relief." *Forever Green I*, 500 B.R. at 429 (emphasis added).

25.    Furthermore, the Petitioning Creditors' stated purpose for filing the Involuntary Petition:  to push White Star's bankruptcy cases into this Court, which the Petitioning Creditors perceived as a more favorable venue for the assertion of their claims, is the type of strategic, intercreditor gamesmanship that numerous courts have found to be an improper purpose for an involuntary filing.  *See, e.g., WLB-RSK Venture*, 296 B.R. at 514 (concluding that it is bad faith for a creditor to file an involuntary petition as a "forum shopping litigation tactic"); *In re Cannon Express Corp.*, 280 B.R. 450, 455-56 (Bankr. W.D. Ark. 2002) (involuntary filing was improper when the motivation was to "obtain a disproportionate advantage" vis-à-vis other creditors, and where the petitioner "gave no consideration as to what effect the petition would have on [the debtor]"); *Hentges*, 351 B.R. at 770-01 (noting that filing an involuntary petition in an effort to obtain a disproportionate advantage against other creditors would constitute bad faith).  The Petitioning Creditors here were so focused on positioning litigation over the relative priority of their mechanic's liens that they consciously risked the fate of White Star's employees, business partners, and going concern value in order to ensure that this Court would determine venue.  Although White Star does not believe that either the Delaware Court or this Court is inherently more "fair" to any group of creditors, such conduct is fundamentally improper.

SC1:4949568.6

26.     Finally, the Petitioning Creditors' reckless conduct was not accidental and they should not be given the benefit of any doubt.  This is not the first case in which the Petitioning Creditors and their counsel have used an involuntary filing for strategic purposes without regard to the consequences for the debtor and its other stakeholders.  *See In re Energy & Exploration Partners Inc.,* Case No. 15-44931 (RFN) (Bankr. N.D. Tex. Dec. 7, 2015), D.I. 2 ¶¶ 3, 33 (testifying that the commencement of the involuntary proceedings by a group of three creditors that included two of White Star's Petitioning Creditors "caused substantial disruption to the Debtors' operations, and forced the Debtors to commence these chapter 11 cases on an expedited basis").[6]

**B.     The Involuntary Case Should be Dismissed Because the Involuntary Petition Fails to Satisfy the Requirements of Section 303(b)(1)**

27.     Section 303(b)(1) of the Bankruptcy Code requires that an involuntary proceeding may only be commenced by "three or more entities," each holding an unsecured claim "that is not contingent as to liability or the subject of a bona fide dispute as to liability or amount."  11 U.S.C. 303(b)(1).  Importantly, section 303(b)(1) was amended by Congress in 2005 to prevent claims where the unsecured *amount* was in dispute from qualifying the holder to file an involuntary petition.  *See In re Henry S. Miller Commercial, LLC*, 418 B.R. 912, 923 (Bankr. N.D. Tex. 2009) (explaining that post-2005, "it is clear that a claim is the subject of a bona fide dispute if *either* the liability itself is in dispute or merely the amount is in dispute. If

---

[6]    The aggressive tactics of certain of the Petitioning Creditors are well known throughout the restructuring industry.  *See, e.g.*, *Another Oil & Gas Company in Bankruptcy — White Star Petroleum Holdings LLC*, PETITION, May 29, 2019, *available at* https://petition.substack.com/p/retail-earnings-suck-oil-and-gas  ("Some trigger happy creditors beat the company to the punch here.  On May 24, five 'purported' creditors filed an involuntary bankruptcy petition against the company in the Western District of Oklahoma. Considering Baker Hughes Oilfield Operations Inc. is among the top 5 largest creditors, we can't say we're that surprised.").

-11-

nothing else, this signals that Congress continues to caution that holders of questionable claims ought not to be allowed to force companies into bankruptcy against their will").

28.     Notwithstanding this express requirement that creditors filing an involuntary petition hold undisputed unsecured claims, the Petitioning Creditors have admitted that the amount of their unsecured claims is entirely uncertain—some mix of contingent, unliquidated, and disputed.  *See* Involuntary Petition Ex. A [Docket No. 1] ("*The amounts set forth may be secured in part* based upon liens filed by one or more of the Creditors.   Based upon information available to the Creditors, the property that *may* be securing their respective [sic] may be subject to prior perfected lien claims.  In addition, *the Creditors have no reliable information* for which they may determine what, if any, valid secured claim that may each hold [sic].  As such, for purposes of this Involuntary Petition, each of the Creditors *alleges* they hold valid unsecured claim [sic] of at least $100,000.  Each of the Creditors reserves the right to file a Proof of Claim to reflect the value of any property securing their claims in amounts as much of more [sic] than shown above [*i.e., the full asserted amount of their claims*]." (emphasis added)).

29.     The Petitioning Creditors have thus provided no factual basis for their allegation that their unsecured claims exceed the statutory threshold.[7]  And mere alleged claims are clearly insufficient to support a voluntary petition.  *See*, *e.g.*, *In re ELRS Loss Mitigation, LLC*, 325 B.R. 604, 609 (Bankr. N.D. Okla. 2005) ("The burden of proof lies with the petitioning creditors to establish a prima facie case that their claims are not subject to a bona fide dispute.").

---

[7]    Some courts, including in the Tenth Circuit, have held that in light of the 2005 amendment to section 303(b), *any* disputed amount renders a claim ineligible to count for an involuntary petition. *See Hentges*, 351 B.R. at 762-63; *but see In re ELRS Loss Mitigation, LLC*, 325 B.R. at 626-27 (concluding that as long as the undisputed portion of the claim exceeded the statutory threshold, a disputed claim could qualify).  However, in this case the Court does not need to reach this difficult issue:  the Petitioning Creditors have provided no indication that *any* portion of their unsecured claim is undisputed.

Any objective basis for a bona fide dispute—either factual or legal—can disqualify an involuntary petition.  *See Bartmann* v. *Maverick Tube Corp.*, 853 F.2d 1540, 1543 (10th Cir. 1988).  Here, the Petitioning Creditors have failed to provide any basis for White Star or the Court to determine whether the Petitioning Creditors are legitimate unsecured creditors that are eligible to be the filing creditors under section 303(b)(1), or whether their claims are secured, disallowable, or otherwise something other than a bona fide, undisputed, unsecured claim.

30.     Furthermore, these Petitioning Creditors have received approximately $3.7 million in avoidable transfers.   As was noted by counsel to the Petitioning Creditors at the May 31 status conference, "courts disagree" as to whether a recipient of a voidable transfer "has standing to initiate an involuntary case."  May 31, 2019 Hr'g Tr. at 26:5-13; 2 *Collier on Bankruptcy* ¶ 303.12[4] (16th ed. 2019); *compare In re Kreidler Imp. Corp.*, 4 B.R. 256, 258-89 (Bankr. D. Md. 1980) (holders of voidable transfers cannot initiate an involuntary case) *with In re Kenval Mktg. Corp.*, 38 B.R. 241, 244 (Bankr. E.D. Pa. 1984) (recipients of voidable preferences may join an involuntary petition).  But the issue in this case is not whether $1 of voidable preferences disqualifies a creditor entirely.

31.     Rather, here the voidable preferences received by the Petitioning Creditors are so large that there is no economic reason for the Petitioning Creditors to surrender their voidable transfers in order to permit the allowance of their other claims.  This raises a *prima facie* question regarding the motives of the Petitioning Creditors and whether they are using *de minimis* unsecured claims as a fig leaf to forum shop for a venue to defend against preference litigation.  In a situation like this, where the value at risk in preference actions would dwarf any unsecured recoveries of the Petitioning Creditors, the Court should reasonably assume that the

Petitioning Creditors' unsecured claims, if any, will be disallowed pursuant to section 502(d) of the Bankruptcy Code, and accordingly are in *bona fide* dispute.

### C.     The Court Should Abstain from the Involuntary Case

32.     If the Court finds that section 303(b)(1) is satisfied, it should nonetheless still dismiss the Involuntary Case on abstention grounds.  Section 305(a)(1) of the Bankruptcy Code permits a court to dismiss proceedings if "the interests of the creditors and the debtor would be better served by such dismissal or suspension." *In re Eastman*, 188 B.R. 621, 624 (B.A.P. 9th Cir. 1995).

33.     In determining whether or not to abstain from hearing a case, courts in the Tenth Circuit have generally considered:  "(1) the motivation of the parties in seeking bankruptcy jurisdiction; (2) whether another forum is available to protect the interests of both parties; . . (3) the economy and efficiency of administration; and (4) the prejudice to the parties." *See, e.g.*, *In re Forest Hill Funeral Home & Mem'l Park*, 364 B.R. 808, 824 (Bankr. E.D. Okla. 2007); *ELRS Loss Mitigation*, 325 B.R. at 634.  These factors are not exclusive, and abstention should be considered by the court on a case-by-case basis based on the totality of the circumstances.  *See ELRS Loss Mitigation*, 325 B.R. at 634; *see also In re Spade*, 258 B.R. 221, 230-31 (Bankr. D. Colo. 2001) ("case law permits courts to consider a wide variety of factors relevant to the facts of the particular case in determining whether to abstain under § 305").

34.     The facts of this case strongly support abstention.  *First*, as discussed above, the Petitioning Creditors' purpose for filing the Involuntary Petition was improper and self-interested without regard to the impact on White Star or its other stakeholders.  The Petitioning Creditors have asserted $5.5 million in claims purportedly secured by mechanic's liens.  By contrast, White Star's secured lenders hold more than $330 million in claims and support White Star's choice of Delaware venue.  No unsecured creditors' committee has yet been

-14-

formed in any of White Star's chapter 11 cases, so the Court cannot assume that White Star's other unsecured creditors support either the Involuntary Petition or venue in this District.

35.    *Second*, the Delaware Court is available to administer all aspects of the White Star bankruptcy cases, including any motions that might be filed by the Petitioning Creditors with respect to their claims, mechanic's liens, or any other issue.  As the Court itself noted, the Delaware Court hears an extraordinary number of chapter 11 cases, and creditors from all over the United States actively participate in these cases.  Indeed, two of the Petitioning Creditors appeared before the Delaware Court at the first day hearing in the Voluntary Cases.

36.    *Third*, while White Star has taken great pains to ensure that its financing and the relief it has received from the Delaware Court is "portable"—*i.e.*, could be transferred and be applicable to chapter 11 proceedings in this Court—moving the venue of the Voluntary Cases would impose incremental costs on White Star and its stakeholders.  The key parties in these cases have already spent substantial resources to prepare for a Delaware bankruptcy case. Shifting the venue at this stage will unavoidably create some additional costs and burdens.

37.    *Fourth*, there is no prejudice to any party if the Court abstains.  The Delaware Court has the authority to grant all the relief this Court could grant.  The Petitioning Creditors are each large companies with capable legal counsel and adequate resources to appear in either a Delaware or Oklahoma proceeding.  There can be no serious disagreement that the Delaware Court is capable of applying settled Oklahoma law to issues relating to the Petitioning Creditors' purported mechanic's liens.  Certainly, requiring a party to litigate in another court of competent jurisdiction is not "prejudicial" in the sense contemplated by courts considering abstention under section 305.  *See ELRS Loss Mitigation*, 325 B.R. at 635.

-15-

38.     *Finally*, abstention is necessary so that the Court does not reward the Petitioning Creditors' anticipatory filing.  Validating the creditors' race to the courthouse by permitting the Involuntary Case to proceed would set a dangerous precedent of usurping a voluntary debtor's responsible bankruptcy filing, and be directly contrary to a core principle of the Bankruptcy Code that such a race to advance individual interests is not permitted.  *See* H.R. REP. NO. 95-595, at 340, *reprinted in* 1978 U.S.C.C.A.N. 5787, 5836, 5963, 6297 (highlighting the importance of ensuring that "those who acted first would [not] obtain payment of the claims in preference to and to the detriment of other creditors"); *In re Rocor Int'l Inc.,* 380 B.R. 567, 574 (B.A.P. 10th Cir. 2007) (permitting payments within the preference period solely if such payments would "further the policy of preventing a race to the courthouse.").

39.     Furthermore, the specter of potential involuntary filings will discourage debtors from building consensus through prepetition negotiations with key creditors, lest the debtor be beaten into court.  *See In re Caesars Entm't Operating Co.*, No. 15-10047 (KG), 2015 WL 495259, at *8 (Bankr. D. Del. Feb. 2, 2015) ("The Court recognizes that rewarding the Petitioning Creditors' preemptive filing in another forum would set a bad precedent for future bankruptcy cases and limit the ability of future debtors to openly negotiate with creditors prior to filing a voluntary bankruptcy petition.").  White Star respectfully submits that the Court should abstain from accepting the Involuntary Case.

## CONCLUSION

For the foregoing reasons, WSP LLC respectfully requests that the Court enter an order dismissing the Involuntary Case, or abstaining from accepting the Involuntary Case, and, in either case without prejudice to White Star's rights under section 303(i) of the Bankruptcy Code.

## NOTICE OF OPPORTUNITY FOR HEARING

**Your rights may be affected.  You should read this document carefully and consult your attorney about your rights and the effect of this document.  If you do not want the Court to grant this requested relief, or you wish to have your views considered, you must file a written response or objection to the requested relief with the Clerk of the United States Bankruptcy Court for the Western District of Oklahoma, 215 Dean A. McGee Avenue, Oklahoma City, OK 73102 no later than June 19, 2019.  You should also serve a file-stamped copy of your response or objection to the undersigned movant/movant's attorney [and others who are required to be served] and file a certificate of service with the Court.  If no response or objection is timely filed, the Court may grant the requested relief without a hearing or further notice.**

**The 12 day period includes the three (3) days allowed for mailing provided for in Bankruptcy Rule 9006(f).**

Dated:  June 7, 2019                                  /s/ John D. Dale
          Oklahoma City, Oklahoma          John D. Dale, OBA No. 19787
                                             GABLEGOTWALS
                                             1100 ONEOK Plaza
                                             100 West 5th Street
                                             Tulsa, Oklahoma 74103-4217
                                           Telephone: (918) 595-4800
                                           Fax: (918) 595-4990
                                           Email: jdale@gablelaw.com

                                           -and-

                                           /s/ Craig M. Regens
                                           Craig M. Regens, OBA No. 22894
                                           GABLEGOTWALS
                                           One Leadership Square
                                           211 North Robinson
                                           Oklahoma City, Oklahoma  73102
                                           Telephone:   (405) 568-3313
                                           Facsimile:    (405) 235-2875
                                           cregens@gablelaw.com

                                           -and-

                                         Andrew G. Dietderich, NY Bar 2850584
                                           Brian D. Glueckstein, NY Bar 4227005
                                           David R. Zylberberg, NY Bar 4912432
                                           SULLIVAN & CROMWELL LLP
                                           125 Broad Street
                                           New York, New York  10004
                                           Telephone:    (212) 558-4000
                                           Facsimile:    (212) 558-3588
                                           dietdericha@sullcrom.com
                                           gluecksteinb@sullcrom.com
                                           zylberbergd@sullcrom.com

                                          *Proposed Co-Counsel to White Star*

SC1:4949568.6

## CERTIFICATE OF MAILING

I hereby certify that on this 7th day of June, 2019, I electronically transmitted the attached document to the Clerk of the Court using the ECF System for filing.  The Clerk of the Court will transmit a Notice of Electronic Filing to the parties and/or entities registered with CM/ECF.


*/s/Craig M. Regens*
Craig M. Regens